IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita L. Weinshienk

Civil Action No. 04-cv-01662-ZLW-CBS

LABORATORY CORPORATION OF AMERICA HOLDINGS d/b/a LABCORP, a
Delaware corporation,

      Plaintiff,

v.

METABOLITE LABORATORIES, INC., a Colorado corporation,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

      The matters before the Court are Metabolite's Motion For Partial Summary Judgment (Doc. No. 62), Plaintiff LabCorp's Motion For Summary Judgment Pursuant To Fed. R. Civ. P. 56(c) (Doc. No. 73), and Metabolite's Motion For Summary Judgment On Post-Mandate Royalties (Doc. No. 121).  The Court has determined that the motions can be resolved on the parties' extensive briefing and that no oral argument is necessary.

## I.    Background

      This case arises from events which were the basis of the United States District Court for the District of Colorado case Metabolite Laboratories, Inc. v. Laboratory Corporation of America Holdings, Civil Action No. 99-cv-00870-ZLW-CBS

(Metabolite I).[1]  Metabolite I involved claims for patent infringement and breach of

contract against Laboratory Corporation of America Holdings d/b/a LabCorp (LabCorp).[2]

A brief synopsis of that case's history is needed to fully understand the present conflict.[3]

In the late 1980's scientists at the University of Colorado and Columbia University

discovered a relationship between elevated levels of total homocysteine in the human

body and a deficiency in either cobalamin (vitamin B12) or folate (folic acid).

Deficiencies in these vitamins can cause serious illness in humans.  In 1990, these

scientists, including Dr. Robert H. Allen, were granted U.S. Patent No. 4,940,658 (the

'658 Patent) for their findings.[4]  This patent involved, *inter alia*, assaying total

homocysteine levels in humans and correlating an elevated level of total homocysteine

with a deficiency in either cobalamin or folate.[5]  This patent was assigned to

Competitive Technologies, Inc. (CTI).[6]

---

[1]This Court handled the previous case and takes judicial notice of all events that occurred therein. Neither party disputes that they are bound by the rulings in the previous case under the doctrine of collateral estoppel. See Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000).

[2]The parties' alignment here is the opposite of Metabolite I: there, LabCorp was the defendant and Metabolite Laboratories, Inc. was a plaintiff.  To avoid confusion, especially given the presence of counterclaims in the present matter, the Court will refer to the parties solely by name.

[3]Additional history of Metabolite I is summarized in Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings [hereinafter Metabolite II], 370 F.3d 1354, 1358-59 (Fed. Cir. 2004), cert. granted, 546 U.S. 999 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

[4]Plaintiff LabCorp's Motion For Summary Judgment Pursuant To Fed. R. Civ. P. 56(c) [hereinafter P. Summ. J.], Ex. 3 (Doc. No. 73; Mar. 2, 2007).

[5]P. Summ. J., Ex. 3.

[6]CTI is not a party in the present case. See Notice Of Dismissal Without Prejudice Of Compl. In Intervention (Doc. No. 52; Oct. 20, 2006).

In 1988, Dr. Allen incorporated Metabolite Laboratories, Inc. (Metabolite) in order to perform the methylmalonic acid and homocysteine assays described in the '658 Patent. Metabolite was later granted a license to use the '658 Patent from CTI. Metabolite developed know-how necessary to automate the testing process and make the '658 Patent commercially viable.

Hoffman-LaRoche, Inc. (HLR), predecessor-in-interest to LabCorp, became interested in obtaining rights to the '658 Patent so that it could commercially offer assays to the medical community to aid in diagnosing various medical issues. On January 31, 1991, Metabolite entered into a contract with HLR (the License Agreement).[7]

The License Agreement controlled the performance of four classes of biochemical assays, collectively referred to as the Licensed Assays, and contained two licenses pertinent to the current conflict.[8] First, Metabolite granted a nonexclusive patent license to HLR in exchange for a 6% royalty to be paid to the patent holder, CTI, for *all assays* using the '658 Patent technology.[9] This license covered both tests performed by HLR (the Licensed Assays) and any Licensed Assays referred to

---

[7]P. Summ. J., Ex. 2 at 1-2 [hereinafter License Agreement]. Technically, the agreement between Metabolite and HLR (and, through merger, LabCorp) is a *sublicense* agreement; the *license* agreement is between CTI and Metabolite. However, since both parties have consistently used License Agreement throughout litigation, this Court will use their nomenclature for consistency. Additionally, the License Agreement refers to an entity called Roche Biochemical Laboratories (RBL), a subsidiary of HLR. The Court will exclusively refer to HLR to minimize confusion.

[8]License Agreement at 1.

[9]Id. at 2-3 (Sections 1.01 & 2.03). Metabolite's license with CTI allowed it to sublicense patent rights.

Metabolite for testing (called Referral Assays).  Second, Metabolite granted a know-how

license to HLR in exchange for a 21.5% royalty, albeit *only for Licensed Assays not*

*referred to Metabolite*: "[i]n consideration of the grants made in ARTICLE I, HLR agrees

to pay to [Metabolite] a royalty of 21.5% in respect to HLR's Net Sales of Licensed

Assays other than Referral Assays."[10]  This know-how license covered

> calibrators used in performance of the Licensed Assays and all
> technology and know-how including technology relating to
> automated apparatus reasonably needed by [HLR] to carry out
> commercial operations with Licensed Assays at no additional
> cost to [HLR]. [HLR] will be free to apply the technology and
> know-how relating to the automation of the assay to any
> related or unrelated assay not covered by this [License]
> Agreement without additional consideration.[11]

The know-how license covered the technology Metabolite had developed that enabled

the automation and increased efficiency of the Licensed Assays.

One of the Licensed Assays was an assay of "homocysteine using methods and

materials falling within the claims of the ['658 Patent]."[12]  HLR offered this assay to its

customers as a total homocysteine assay performed on serum samples (Homocysteine-

Only Test), a test which the parties have also referred to as the "Homocysteine-Only

Assay" and "Test No. 706994."[13]

_____

[10]Id. at 3 (Section 2.02).

[11]Id. at 2-3 (Section 1.02).

[12]Id. at 1.

[13]There was also a homocysteine assay performed on urine samples that is not a subject of the present lawsuit.

From 1991 through mid-1998, HLR (and, after merger, LabCorp[14]) performed the Homocysteine-Only test using Metabolite's methodology and paid full royalties due under the License Agreement.  In 1998, LabCorp began to perform the Homocysteine-Only Test using an immunoassay kit provided by Abbott Laboratories (the Abbott Test). LabCorp's belief was that the Abbott Test did not infringe on the '658 Patent and, as such, was not a Licensed Assay.  LabCorp notified Metabolite in August 1998 that it would no longer be paying patent royalties or know-how royalties for Homocysteine-Only Tests performed using the Abbott Test.[15]

Shortly thereafter, CTI and Metabolite brought suit against LabCorp for patent infringement and breach of contract.  On November 20, 2001, a jury returned a verdict finding that LabCorp's use of the Abbott Test had infringed the '658 Patent, awarding patent infringement damages to CTI.[16]  Additionally, the jury found LabCorp had "breached its license agreement by terminating it with respect to its performance of the Abbott test,"[17] and awarded $3,652,724.61 in breach of contract damages to Metabolite.[18]

---

[14]See Metabolite's Mot. For Partial Summ. J., Ex. D (Doc. No. 62; Nov. 8, 2006).

[15]P. Summ. J., Ex. 4 (letter to Metabolite from LabCorp).

[16]P. Summ. J., Ex. 9 (Amended Judgment in Metabolite I). The patent infringement damages were subsequently doubled by the Court after trial due to the jury's finding of willful infringement. Id.

[17]P. Summ. J., Ex. 8 (jury verdict in Metabolite I) [hereinafter Special Verdict Form].

[18]P. Summ. J., Ex. 9.

After trial, Metabolite and CTI moved under Section 283 of the Patent Act to permanently enjoin LabCorp from performing "any homocysteine-only test, including without limitation homocysteine-only tests via the Abbott method."[19]  The Court granted the motion, and LabCorp moved for a stay of the injunction.[20]  LabCorp maintained that while it was willing to pay patent royalties to CTI for tests performed during the stay period, Metabolite would have to bring a separate lawsuit to recover any breach of contract damages for tests performed during that period since the injunction, issued under the Patent Act, applied only to patent infringement and not breach of contract.[21]

The Court ultimately entered a Stipulated Order Staying Injunction Pending Appeal (Stipulated Stay Order) ordering LabCorp to pay a 6% royalty to CTI for all Homocysteine-Only Tests performed after entry of judgment, and requiring LabCorp to provide Metabolite with an accounting of 21.5% of the Net Sales attributable to the Homocysteine-Only Tests that LabCorp performed after entry of judgment.[22] Specifically, the Order required:

> 4. <u>Payments, Accounting and Bond for Metabolite.</u>  With respect to all homocysteine-only assays of serum, LabCorp shall provide to Metabolite an accounting of such assays

---

[19]LabCorp's Opp'n To Metabolite's Mot. For Summ. J. On Post-Mandate Royalties [hereinafter LabCorp's Opp'n], Ex. 3 at 3 (Doc. No. 130; Oct. 8, 2007).

[20]P. Summ. J., Ex. 10 (Order in <u>Metabolite I</u> dated Nov. 19, 2002).  Under Federal Circuit precedent at the time, a permanent injunction was mandatory after a finding of patent infringement and the Court found no sound reason for denying it. <u>See Richardson v. Suzuki Motor Co., Ltd.</u>, 868 F.2d 1226, 1247 (Fed. Cir. 1989).

[21]P. Summ. J., Ex. 17 [hereinafter 9/21/2006 Order].

[22]P. Summ. J., Ex. 11.

performed since November 1, 2001 through November 30, 2002, no later than December 31, 2002, and a monthly accounting for each month beginning with December 2002 no later than the last day of the following month. Such accounting shall certify the number of such homocysteine assays performed by LabCorp during the month presented, the Net Sales attributable thereto and 21.5% of Net Sales. LabCorp will secure its obligation to pay such 21.5% amount to Metabolite (in the event it is held liable therefor in this case) with a bond or letter of credit in an amount that increases monthly to equal the accounted-for amount.[23]

The Stipulated Stay Order stated that entry of the order:

is without prejudice to any party's position or arguments on appeal or otherwise in this case. In particular, without limiting the generality of the foregoing, this stipulated Order does not compromise or otherwise affect any claim for damages, or defenses thereto, for assays performed by LabCorp subsequent to the date of the Special Verdict in this case or during the pendency of the appeal or any remand. This stipulated Order is not and shall not be construed to create or provide an interim license between the parties hereto.[24]

LabCorp promptly established a letter of credit on January 27, 2003.[25]

On August 12, 2004, the United States Court of Appeals, Federal Circuit entered its mandate in the Metabolite I appeals case (Metabolite II) affirming this Court's decisions.[26] Pursuant to the terms of the Stipulated Stay Order, the stay on the permanent injunction was lifted on this date. In anticipation thereof, on August 10,

---

[23]Id. at 2.

[24]Id. at 3 ¶ 7.

[25]P. Summ. J., Ex. 20.

[26]LabCorp's Opp'n, Ex. 5; Metabolite II, 370 F.3d 1354.

2004, LabCorp announced its intentions to outsource the Homocysteine-Only Tests to another laboratory independently licensed by CTI to perform '658 Patent assays.[27]  CTI objected that this arrangement violated the injunction.  This Court ultimately decided, in an order entered in <u>Metabolite I</u> dated September 21, 2006 (9/21/2006 Order), that all Homocysteine-Only Tests outsourced to another '658 Patent licensee did not violate the permanent injunction issued in that case.[28]

On August 12, 2004, LabCorp filed the present action requesting a declaratory judgment that it "has not violated the [License] Agreement with various conduct occurring since the time of initial entry of the Amended Judgment and occurring into the future."[29]  In the 9/21/2006 Order the Court ruled that there has "never been a legal determination that LabCorp actually committed any breach [of the License Agreement] after the date of the Amended Judgment, or the amount of any resulting damages," and that any determination of breach would have to be made in the present case as a matter of procedure, since no claims remained to be adjudicated in <u>Metabolite I</u>.[30]

On July 9, 2007, the '658 Patent expired.

---

[27]P. Summ. J., Ex. 13.

[28]P. Summ. J., Ex. 17.  The record indicates that LabCorp outsourced the Homocysteine-Only Test until the '658 Patent term expired.

[29]LabCorp's First Am. Compl. For Declaratory J. (Doc. No. 29; May 16, 2005).

[30]9/21/2006 Order at 7-8.

**II.    Current Issue**

The Stipulated Stay Order left open the question of whether LabCorp has a legal obligation to pay a 21.5% royalty to Metabolite for Homocysteine-Only tests performed after the date that the Amended Judgment was entered. **No court has decided the issue of whether the jury's verdict in <u>Metabolite I</u> terminated the know-how license in the License Agreement with respect to the Homocysteine-Only Test.**[31] That question is now before the Court.

LabCorp maintains that the jury in <u>Metabolite I</u> found that the License Agreement had been terminated as to the Homocysteine-Only Test in its entirety (both the patent and know-how licenses) and thus there was no contract remaining which could be breached after judgment was entered. Metabolite contends that the jury found only the *patent* portion of the License Agreement (with its corresponding 6% royalty to CTI) had been terminated, not the *know-how* portion (with its corresponding 21.5% royalty to Metabolite), and that LabCorp's post-judgment performance of the Homocysteine-Only Test breached the still-active know-how license.

This Court stated in dicta in the 9/21/2006 Order that "neither the jury verdict nor the Federal Circuit opinion established that the know-how license was terminated, only that the patent license was terminated."[32] The Court reconsiders that statement in view of the parties' further briefing of that issue.

_____

[31]<u>See id.</u>; <u>Metabolite II</u>, 370 F.3d 1354.

[32]9/21/2006 Order at 7.

### III.    Relief Requested

In its single-count First Amended Complaint, LabCorp seeks a declaratory judgment that it is not liable to Metabolite for any royalties with respect to the Homocysteine-Only Test performed after entry of judgment in Metabolite I.

Metabolite objects to this relief and asserts five counterclaims.[33]  First, Metabolite claims LabCorp has breached both the License Agreement and the letter of credit agreement by refusing to pay know-how royalties after the jury verdict in Metabolite I. Metabolite also claims that failure to pay these royalties constitutes a breach by LabCorp of its obligations of good faith and fair dealing under these agreements.  Next, Metabolite claims that LabCorp is estopped by both promissory estoppel and equitable estoppel from repudiating its promise to pay Metabolite the post-trial know-how royalties.  Finally, Metabolite claims that LabCorp committed fraud by materially representing that it would pay know-how royalties but then failing to do so.

In the motions presently before the Court, LabCorp is seeking summary judgment in its favor on its single claim and all of Metabolite's counterclaims.  Metabolite is seeking summary judgment in its favor solely on its breach of contract counterclaim and on LabCorp's declaratory judgment claim.

---

[33]Metabolite previously dismissed without prejudice Counterclaim III, its counterclaim for unjust enrichment. Unopposed Mot. To Amend Countercls. (Doc. No. 125; Sep. 5, 2007).

## IV.    Summary Judgment Standard

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[34]  A dispute is "genuine" if the issue could be resolved in favor of either party.[35]  A fact is "material" if it might reasonably affect the outcome of the case.[36]

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue.[37]  Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper.[38]  All the evidence must be viewed in the light most favorable to the party opposing the motion.[39]  However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence.[40]

---

[34]Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[35]Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[36]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[37]Concrete Works of Colorado, Inc. v. City and County of Denver, 36 F.3d 1513, 1517 (10th Cir. 1994).

[38]Id. at 1518.

[39]Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

[40]Rice v. United States, 166 F.3d 1088, 1092 (10th Cir. 1999).

V.     **Analysis**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Venue is proper in this court pursuant to 28 U.S.C. § 1391.

The Court finds that there is no genuine issue of material fact and, therefore, summary judgment is appropriate to resolve the issues presented in the parties' motions.

Resolution of all claims in this case depends on whether the know-how license with respect to Homocysteine-Only Tests survived the jury verdict in Metabolite I.[41]  This Court previously found that the appellate opinion entered in Metabolite II does not directly address this issue.[42]  The issue on appeal before the Federal Circuit was whether the jury could properly find that the License Agreement was breached although LabCorp admittedly never formally terminated the License Agreement by written notice as required by the agreement.[43]  Metabolite II quickly dismissed this argument by holding that this written notice was not necessary.[44]  The Federal Circuit was not asked

---

[41]For the remainder of the Order, unless specified otherwise, the know-how license refers only to the license with respect to Homocysteine-Only Tests.

[42]9/21/2006 Order at 7.

[43]Metabolite II, 370 F.3d at 1269-70.

[44]Id. at 1270.

to determine which portions of the license agreement *were* terminated - only that the license agreement *could* be terminated.

Therefore, to determine if the know-how license survived the verdict, the Court must examine the two potential sources of such a license.  First, regardless of the jury verdict in <u>Metabolite I</u>, the Stipulated Stay Order must be reviewed to determine if it created a new contractual relationship between the parties with respect to the know-how.  If not, the know-how license from the License Agreement must then be analyzed to determine if the know-how license continued to exist after judgment was entered in <u>Metabolite I</u>.

A.     *Stipulated Stay Order*

The Stipulated Stay Order was previously examined by this Court in the 9/21/2006 Order.  In that order, the Court made findings of fact and conclusions of law about issues relating to both the permanent injunction hearing held in <u>Metabolite I</u> and the contents of the Stipulated Stay Order.  The Court incorporates those findings and conclusions by reference and reproduces the following portion of the 9/21/2006 Order for ease of reference:

> This Court held a hearing on LabCorp's motion to stay the injunction on November 26 and 27, 2002.  At the outset of the hearing, the Court voiced concern that patient care would be endangered if the testing were to be halted by an injunction. The Court went on to address the royalties that would be incurred during a stay of the injunction, indicating that the parties should try to reach some reasonable agreement as to a royalty to be paid during the stay period, and voicing doubt

that the Court itself could or should impose such a payment absent the parties' agreement. The License Agreement contained two different licenses: a patent sublicense in exchange for a 6% royalty, and a know-how license in exchange for a 21.5% royalty. LabCorp's counsel maintained throughout the . . . hearing that while LabCorp was willing to pay CTI the 6% patent royalty, Metabolite had no right to any royalty payment for tests performed during a stay of the injunction because the injunction was issued pursuant to 35 U.S.C. § 283, which authorizes injunctions to prevent the violation of patent rights, and Metabolite is not a patent holder, but rather a patent licensee. LabCorp's counsel noted that Metabolite had never requested an injunction premised on a breach of the License Agreement, and that there had been no presentation of evidence concerning future breach of contract damages at trial. LabCorp's counsel indicated that Metabolite would have to bring another lawsuit in order to recover any breach of contract damages it incurred after trial. The Court agreed that Metabolite was not entitled to an injunction under the Patent Act, and asked [Metabolite's] counsel for authority under which Metabolite could be entitled to an injunction. [Metabolite's] counsel did not provide, and to date has not provided, any such authority. Rather, [Metabolite's] counsel acknowledged that the issue of ongoing payment of the 21.5% royalty was "a challenging legal question." The Court stated that if the Federal Circuit affirmed the jury verdict, then the "real solution would be" for the parties to work out a license agreement, rather than having Metabolite come into court every two or three years with a new breach of contract claim. LabCorp's counsel agreed. The Court ultimately ordered from the bench that LabCorp pay the 6% royalty and put the 21.5% royalty into an escrow or trust account pending appeal. In the context of the 21.5% royalty the Court stated that "there are some issues that the Circuit is going to have to decide about this breach of contract case. And maybe one of the issues is going to be issues (sic) concerning future injunctive relief. I don't know. But I think that's an iffy area. So let's put that someplace where it will be safe and that will satisfy [LabCorp]."

On January 13, 2003, the Court entered a . . . [Stipulated Stay Order] which modified the Order issued at oral argument. The Stipulated Stay Order ordered that LabCorp

was to pay a 6% royalty to CTI for tests performed from November 1, 2002, though final disposition of the case, and was to provide Metabolite with an accounting of 21.5% of the Net Sales attributable to the tests LabCorp performed after November 1, 2001.  The Stipulated Stay Order stated that LabCorp will "secure its obligation to pay such 21.5% amount to Metabolite (in the event it is held liable therefor in this case) with a bond or letter of credit . . . ."  The final paragraph of the Stipulated Stay Order stated that the order "does not compromise or otherwise affect any claim for damages, or defenses thereto, for assays performed by LabCorp subsequent to the date of the Special Verdict in this case or during the pendency of the appeal or any remand."[45]

Metabolite would like this Court to interpret the phrase "in the event [LabCorp] is held liable therefor in this case" from the Stipulated Stay Order to mean that once the appeals process was complete, all royalties secured under the letter of credit immediately became guaranteed and the Court was obligated to issue an order releasing those funds.  In other words, Metabolite wants this Court to interpret the Stipulated Stay Order as either implicitly recognizing that the know-how license survived termination or that the Stipulated Stay Order created a new agreement between the parties with respect to the know-how license which incorporated the terms of the original License Agreement.  However, the plain language of the Stipulated Stay Order does not support Metabolite's interpretations.

At the time the Stipulated Stay Order was issued, the matter before the Court was the stay of the *patent* injunction previously issued pursuant to 35 U.S.C. § 283. The status of the *know-how* license was not necessary to resolve the matter.  The

---

[45]9/21/2006 Order at 2-4 (citations omitted; emphasis added).

Court's order did not attempt to resolve all outstanding issues between the parties. Instead, the Court was simply helping to facilitate a solution where LabCorp could continue administration of the Homocysteine-Only Test in order to ensure patient care was not endangered.

The Stipulated Stay Order made clear that it was not deciding the merits of any other outstanding issue, including post-judgment know-how royalties. Nowhere in the Stipulated Stay Order did LabCorp admit that it owed these know-how royalties. Rather, the clear language in the final paragraph (labeled "No Prejudice") indicates just the opposite: LabCorp was reserving the right to fight over the know-how issue in the future.[46]

Additionally, the arrangement outlined in Section 2 of the Stipulated Stay Order (concerning patent royalties) versus Section 4 (concerning know-how royalties) is radically different. There is no doubt that the Stipulated Stay Order created a new license obligation, lasting for the duration of the stay, regarding the patent royalties.[47] This obligation is reflected in the non-conditional language of Section 2: "LabCorp shall pay . . . [CTI];" these "payments shall be made . . . each calendar month."[48] If the same obligation was desired for the know-how royalties, it follows that the same, or at least

---

[46]See supra note 24 and accompanying text.

[47]This new license obligation is consistent with the language in Section 7 of the Stipulated Stay Order that it "shall not be construed to create or provide an interim license between the parties." The continued payment of the patent royalties was not intended to be an all-encompassing business agreement but rather an arrangement to keep the status quo contingent on the actions of an independent third party: the Federal Circuit.

[48]P. Summ. J., Ex. 12 at 1-2 (emphasis added).

16

similar, language would have been used to indicate this intent.  Instead, Section 4

describes a vastly different, complex accounting system for keeping these royalties in

escrow with no guarantee of payment: "LabCorp shall provide to Metabolite an

<u>accounting</u>" (not a payment), the royalty obligation should be <u>secured</u> "with a bond or

letter of credit," and this obligation is due <u>only "in the event [LabCorp] is held liable

therefor in this case.</u>"[49]

The parties formed a new, temporary agreement relating to patent royalties for

the Homocysteine-Only Test that incorporated the same terms as the original License

Agreement.  No similar understanding was formed relating to the know-how license.

The letter of credit was nothing more than a safeguard to protect the royalties *if*

Metabolite was later determined to have a valid claim to those royalties; it was not a

guarantee that Metabolite would receive any money.  The Court agreed that the

appropriate course of action was to resolve the patent licensing issues related to the

mandatory injunction, to safeguard know-how royalties in case Metabolite was entitled

to them, and to defer the question of know-how entitlement until a later date.[50]

Metabolite also contends that the legal arguments made by LabCorp in

<u>Metabolite I</u> regarding the permanent injunction constitute definitive proof that LabCorp

admitted that the know-how license survived the verdict.  To the extent that these

---

[49]<u>Id.</u> at 2 (emphasis added).

[50]From a judicial efficiency standpoint, the Court's decision makes the most sense: if an appellate court had reversed the jury's verdict, resolution of the "challenging legal question" regarding the know-how royalties would have become moot.

alleged statements are even admissible under Fed. R. Evid. 408,[51] they are irrelevant in light of the fact that a *stipulated* agreement was reached, which was subsequently approved by the Court.  Whatever the parties' positions during the negotiation phase, these differences were necessarily resolved when a stipulation was reached on the issues in contention.  All parties agreed on the form of the stipulation, and this Court did not need to impose the Court's authority with regard to any of the details.  Further, no objections were voiced at the time the order was adopted by the Court.  The Stipulated Stay Order speaks for itself and stands as the entire integrated agreement between the parties.[52]

Therefore, the Stipulated Stay Order neither established nor created Metabolite's right to know-how royalties for the Homocysteine-Only Test.  Since there currently is no legal obligation to release the funds secured by the letter of credit, LabCorp has breached neither the Stipulated Stay Order nor the letter of credit agreement. Therefore, as a matter of law, LabCorp is entitled to summary judgment on Metabolite's breach of contract (Counterclaim I) and breach of obligation of good faith and fair dealing (Counterclaim II) claims.  Further, since the Stipulated Stay Order explicitly states that LabCorp reserved the right to pursue other defenses in case it lost its appeal, LabCorp has not breached any promises, implied or explicit, made to

---

[51]The events leading up to the entry of the Stipulated Stay Order could reasonably be viewed as "conduct or statements made in compromise negotiations regarding the claim." Fed. R. Evid. 408(a)(2). As such, they would not be admissible to prove liability for a claim. Fed. R. Evid. 408(a).

[52]See Restatement (Second) Contracts, § 209 (a written agreement presumed to be integrated) and § 213 (an integrated agreement discharges prior inconsistent agreements).

18

Metabolite.  Accordingly, LabCorp is entitled to summary judgment on Metabolite's

promissory estoppel (Counterclaim IV), fraud (Counterclaim V), and equitable estoppel

(Counterclaim VI) claims.  Thus, all counterclaims will be resolved in favor of LabCorp

and against Metabolite.

Metabolite's post-judgment right to collect know-how royalties must, if at all,

derive from the original License Agreement.


B.    *License Agreement*

It is well established that the original License Agreement obligated LabCorp to

pay a 21.5% know-how royalty on the net sales of the Homocysteine-Only Tests

performed, regardless of the methodology used for the test.  LabCorp has paid all

royalties due under the License Agreement up to the time of the judgment.[53]  Whether

know-how royalties are due post-judgment is what the Court must now decide.

Metabolite revives LabCorp's appellate argument from Metabolite II that

regardless of the jury verdict, the know-how license has never been formally terminated

under the express requirements of the License Agreement.[54]  Under the agreement,

LabCorp has the right to terminate with respect to the Homocysteine-Only Test if a

"more cost effective commercial alternative is available that does not infringe a valid and

---

[53]LabCorp properly paid all royalties due until August 1998, and, as a result of the judgment in Metabolite I, subsequently paid all royalties due from August 1998 until judgment was entered in November 2002.

[54]Metabolite II, 370 F.3d at 1370 ("LabCorp contends that it did not formally terminate the contract, because the contract requires the licensee provide written notice.").  Conversely, LabCorp now adopts Metabolite's position from Metabolite II.

enforceable claim of the [patent]."[55]  Termination requires sixty days written notice to

Metabolite.[56]  Metabolite claims that since it never received written notice regarding

termination of the Homocysteine-Only Test, LabCorp admits by its own actions that the

license is still active.[57]

Regardless of which party is making this claim, Metabolite II already addressed

and rejected the argument that written notification was necessary.  The Federal Circuit

held that LabCorp's refusal to pay royalties on the Homocysteine-Only Test was a

material breach of the License Agreement.[58]  "A material breach . . . constitutes

termination even where the license agreement termination clause does not expressly so

provide."[59]  Therefore, the License Agreement was materially breached by LabCorp as

of August 1998 when LabCorp ceased paying royalties on the Homocysteine-Only Test.

---

[55]License Agreement at 6 (Section 4.02).  The License Agreement could also be terminated in its entirety when all Licensed Patents had expired. Id. at 5 (Section 4.01).

[56]Id. at 6 (Section 4.02).

[57]Subsequent to the filing of Metabolite's summary judgment motions, LabCorp, in an "abundance of caution," provided written notification to Metabolite on August 21, 2007 that it was terminating the License Agreement with respect to the Homocysteine-Only Test pursuant to Section 4.02 of the agreement. LabCorp's Opp'n, Ex. 13.

[58]Metabolite II, 370 F.3d at 1370 (citing Dow Chem. Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000)).

[59]Metabolite II, 370 F.3d at 1370 (citing Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 11 (1st Cir. 2000); Restatement (Second) of Contracts § 237 (1981)); see also Nolan ex rel. Nolan v. Ho, 577 A.2d 143, 146 (N.J. 1990) ("When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement.") (citation omitted).

No formal written termination was required by LabCorp due to this material breach; the breach itself served as the requisite notice.[60]

At this stage of the case, whether the entire License Agreement either was or could have been terminated by Metabolite due to the material breach is not at issue.[61] Metabolite's acquiescence in the continued performance of the License Agreement by LabCorp with respect to all Licensed Assays other than the Homocysteine-Only Test after judgment was entered indicates that Metabolite desired that the contract continue.[62]

Therefore, Metabolite's position in this matter necessarily becomes that, although the contract was materially breached, Metabolite never exercised its right to terminate the contract.  To this end, Metabolite highlights that LabCorp continued to pay royalties on all Licensed Assays other than homocysteine assays.[63]  Metabolite concludes that LabCorp understood and accepted that the License Agreement was not terminated, and any argument by LabCorp otherwise would be counter to LabCorp's own actions.

---

[60]Metabolite II, 370 F.3d at 1370.

[61]Although Metabolite II holds that a material breach constitutes termination, the cases cited immediately after this proposition in that case state that there is only a *right* to terminate. Metabolite II, 370 F.3d at 1370; Apex Pool, 419 F.2d at 562 (material breach gives right to terminate); Ross-Simons, 217 F.3d at 11 (same).

[62]See McSweeney v. Equitable Trust Co., 22 A.2d 282, 285-86 (N.J. 1941); see also Brown v. City of S. Burlington, Vt., 393 F.3d 337, 343 (2d Cir. 2004) ("It is a generally accepted principle that a voidable contract can be cured by ratification through express or implied conduct . . .").

[63]Metabolite's Mot. For Partial Summ. J. at 11.

21

However, LabCorp's actions are consistent with its theory that only the licenses associated with the Homocysteine-Only Test were terminated. LabCorp does not dispute that the remainder of the License Agreement is still in effect. Rather, LabCorp maintains that because Metabolite I dealt solely with the Homocysteine-Only Test, this was the only contract term before the Court and jury.

The terms of the License Agreement, controlled by New Jersey state law,[64] confirm that bifurcation of an individual Licensed Assay from the License Agreement was both anticipated and desired by the parties. Contractual interpretation is a question of law to be determined by the Court.[65] New Jersey law directs expansive interpretation of contracts, allowing

> broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties. Extrinsic evidence may be used to uncover the true meaning of contractual terms. It is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract.[66]

Extrinsic evidence "includes both contractual language and 'the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'"[67]

---

[64]License Agreement at 10 (Section 6.05); Metabolite II, 370 F.3d at 1370.

[65]Driscoll Const. Co., Inc. v. N. J. State Dept. of Transp., 853 A.2d 270, 276 (N.J. Super. Ct. App. Div. 2004).

[66]Conway v. 287 Corporate Center Associates, 901 A.2d 341, 347 (N.J. 2006).

[67]Kearny PBA Local #21 v. Town of Kearny, 405 A.2d 393, 400 (N.J. 1979) (citation omitted).

In the License Agreement, the parties split the Licensed Assays into four distinct classes: homocysteine, methylmalonic acid, 2-methylcritic acid, and crystathionine.[68] Each of these classifications is handled separately in the termination section.[69] Most important, the termination section states that the License Agreement can be terminated by LabCorp "with respect to a particular Licensed Assay."[70]

Language elsewhere in the contract reinforces the parties' intent to make the License Agreement severable with respect to individual Licensed Assays. For example, a severability provision exists which states that if one portion of the contract is found to be invalid, the rest of the contract remains valid, legal, and enforceable.[71] This language mirrors, and is consistent with, the concept of severability embodied in the termination section. Additionally, the License Agreement contains an integration clause stating that the contract stands for the entire agreement between the parties.[72] The contractual terms, negotiated in an arms' length business transaction between sophisticated business entities, clearly indicates that the parties bargained for an

---

[68]License Agreement at 1-2.

[69]Id. at 6 (Section 4.02).

[70]Id. (emphasis added).

[71]Id. at 10 (Section 6.06).

[72]Id. (Section 6.08).

agreement which allowed excision of individual Licensed Assays without consequence to the rest of the agreement.[73]

The logical result of this severability, and the conclusion critical to resolving the current conflict, is that the <u>License Agreement is terminable as to an individual *assay* as opposed to the *licenses* associated with that assay</u>.  Termination of a Licensed Assay, whether through expiration of its corresponding patent or by a material breach, results in the loss of all rights under the contract, albeit only for that assay.  Both the patent and know-how licenses are dependent on the same underlying obligation: the existence of a Licensed Assay.

> HLR agrees to pay to [Metabolite] a royalty of 21.5% in respect to HLR's Net Sales of <u>Licensed Assays</u> other than Referral Assays.
> . . .
> [HLR] agrees to pay to [CTI] . . . all royalties due . . . on Sales . . . of Referral Assays and <u>Licensed Assays</u>.[74]

Thus, once an assay is no longer classified as a Licensed Assay, neither the patent nor the know-how license provisions require payment of a royalty.

---

[73]<u>See</u>, <u>e.g.</u>, <u>E. Brunswick Sewerage v. E. Mill Assocs., Inc.</u>, 838 A.2d 494, 497 (N.J. Super. Ct. App. Div. 2004) ("Generally, contracts are given their plain and ordinary meaning.  When the terms of the contract are clear, the court must enforce them as written."); <u>Trinity Church v. Lawson-Bell</u>, 925, A.2d 720, 725-27 (N.J. Super. Ct. App. Div. 2007) (sophisticated business entities are presumed to understand consequence of terms present in contract); <u>Solondz v. Kornmehl</u>, 721 A.2d 16, 21-22 (N.J. Super. Ct. App. Div. 1998).

[74]License Agreement at 3 (Sections 2.02, 2.03) (emphasis added).  LabCorp also owed 43% on all tests referred to Metabolite. <u>Id.</u> (Section 2.01).  Since Referral Assays are the subset of Licensed Assays that are referred to Metabolite for testing, it is not necessary to discuss them independently of Licensed Assays.

Metabolite argues that its evidence, primarily consisting of License Agreement drafts and Dr. Allen's statements regarding the contractual negotiations, indicates that the know-how license was intended to be treated differently from the royalties license. Drafts and testimony might be useful to explain ambiguous terms under New Jersey's standards of contractual interpretation. However, there is no ambiguity in the License Agreement. As mentioned previously, the contract provides clearly and consistently throughout that it is severable with respect to individual Licensed Assays.

If Metabolite wanted the License Agreement to treat the know-how license differently than the patent license, it could have made this distinction clear in the final agreement. Cryptic annotations in rejected drafts and Dr. Allen's testimony given during the course of this litigation, over fifteen years after the contract was drafted, are insufficient to counter the clear mandates contained in the License Agreement.[75] Simply stated, the contract allows severability, and it makes no distinction between the various licenses regarding this severability. Changing the contract at this stage would be akin to "rewrit[ing] the contract or [giving Metabolite] a better deal than that for which [it] expressly bargained."[76] The Court declines to perform such a rewrite.

---

[75]The parties spent a substantial amount of resources arguing whether Dr. Allen's testimony was proper under the rules of evidence. See, e.g., P.'s Mot. To Strike Decl. Of Robert H. Allen, M.D. Submitted By Metabolite In Supp. Of Its Opp'n Br. (Doc. No. 90; May 22, 2007). This Court ordered that these evidentiary objections would be ruled on as required to resolve the summary judgment motions. Order (Doc. No. 132; Nov. 13, 2007). Given the Court's conclusions, there is no need to rule on any of these evidentiary motions. To the extent that the Court has used Dr. Allen's declarations, all objections were resolved in favor of Metabolite given the ultimate disposition of this case.

[76]Solondz, 721 A.2d 21 (citing Hartford Fire Ins. v. Riefolo Constr. Co, Inc., 390 A.2d 1210 (N.J. Super. Ct. App. Div. 1978), aff'd, 410 A.2d 658 (N.J. 1980)). "[The p]laintiff is bound by the deal he made. Th[e] court may not relieve plaintiff from the hardship that might have been guarded against. [The court]

Therefore, LabCorp's material breach of the License Agreement by switching to the Abbott Test terminated <u>all</u> licenses associated with the Homocysteine-Only Test.

### C.    Jury Verdict

Metabolite's remaining argument is that the jury verdict in <u>Metabolite I</u> indicates that only the patent license was terminated.  Such a determination, given the overwhelming contractual language directing the contrary result, needs to be clearly articulated on the face of the jury verdict.  However, the jury's verdict contains no such clear determination and indicates just the opposite: that the contract was terminated with respect to the Homocysteine-Only Test without regard to any individual royalty license.

Analysis of <u>Metabolite I</u> can be limited solely to the content of the jury's Special Verdict Form.  This form contained eleven total questions although, depending on the answer to certain questions, not all questions were required to be answered.  To begin, Question No. 1 asked the jury:

> Do you find, by a preponderance of the evidence, that Defendant LabCorp is licensed under the '658 patent and that license has not been <u>terminated</u> in whole or in part?[77]

The jury answered the question "No" and thus decided that some portion of the License Agreement had been *terminated*, not just breached.  As a result of the answer

---

must enforce the contract which the parties themselves have made." <u>Solondz</u>, 721 A.2d at 22 (<u>citing</u> <u>Kampf v. Franklin Life Ins. Co.</u>, 161 A.2d 717 (N.J. 1960)).

[77]Special Verdict Form at 1 (emphasis added).

to Question 1, the jury skipped Questions 2-4.[78]  These skipped questions directly deal

with the situation where the License Agreement was not terminated but instead was

only breached, asking for the amount of damages to compensate for the breach.[79]  If the

jury found the contract was breached, the instructions required them to answer <u>both</u>

Question 3 (know-how royalties due) and Question 4 (patent royalties due).[80]  Mirroring

the termination instructions, a finding of breach but no termination would have required

determination of damages for all licenses, not a selected subset, again consistent with

an assay-based view of the License Agreement rather than a license-based view.

The jury next answered Question No. 5:

> Do you find, by a preponderance of the evidence, that LabCorp
> breached its license agreement by <u>terminating</u> it with respect
> to its performance of the Abbott Test?[81]

The jury answered in the affirmative.  In answering this question the jury was

deciding whether performance of the Abbott Test, which replaced the testing

methodology used with respect to the Homocysteine-Only Test, terminated the contract

with respect to <u>the Abbott Test only</u>.  Read together with the answer to Question No. 1,

the combined answers indicate the jury found that the License Agreement had been

terminated in part and that termination was limited to removing the Homocysteine-Only

---

[78]<u>Id.</u>

[79]<u>Id.</u> at 1-2.

[80]<u>Id.</u> at 2.

[81]<u>Id.</u> (emphasis added).

Test from the assays allowed to be performed under the contract.  As a result of these answers, the jury was instructed to determine both breach damages for Metabolite (Question No. 6) and patent damages for CTI (Question No. 7-9).[82]

Question No. 6 succinctly asked:

> State the damages, if any, to plaintiff Metabolite for the breach of contract.[83]

Although the jury was given the option of determining that Metabolite suffered no damages due to the breach, this is not relevant for purposes of determining termination, since the issue of termination was already decided in Question No. 5.  The significance of this question is that once termination was decided, the jury was required to determine the breach of contract damages resulting from the termination.

Metabolite advances an argument requiring a construction of the jury verdict form resting on the selective capitalization of "License Agreement."  Specifically, Metabolite argues that an uppercase "License Agreement" in the form refers to the entire agreement while a lowercase "license agreement" refers only to the patent license.  This argument seeks to create a controversy where there is none.  A plain reading of the verdict form, coupled with the language of the License Agreement, leads to the conclusion that the License Agreement was both breached and terminated with respect to the Homocysteine-Only Test.

---

[82]Id. ("IF YOU ANSWERED 'YES' TO QUESTION NO. 5, THEN ANSWER THE REST OF THE QUESTIONS.") (emphasis added).

[83]Id.

28

Finally, Metabolite argues that it never asked the jury in <u>Metabolite I</u> for future, post-judgment damages since it had no desire to terminate the know-how license.  This argument is unavailing.  The manner in which Metabolite argued damages to the jury, and the corresponding amount of damages claimed, was Metabolite's own decision. Metabolite was not limited by this Court to arguing only pre-verdict damages, and it was entitled to all damages arising from LabCorp's breach of contract.[84]  By choosing to argue only a subset of potential damages, Metabolite is limited to those damages.

## VI.    Conclusion

Unlike copyright, trademark, or patents, the knowledge that was the basis of the know-how license was not subject to enhanced protection under either state or federal law.  The present conflict boils down to an attempt to create more expansive intellectual property rights for knowledge not protected by these traditional means.  As such, profiting from this know-how knowledge is based solely on the contractual relationship between the parties.

The parties were aware of this limitation during the course of the contractual negotiations that led to the creation of the License Agreement.  The plan they settled on

---

[84]Compensatory contract damages "put the innocent party into the position he or she would have achieved had the contract been completed." <u>Totaro, Duffy, Cannova and Co. v. Lane, Middleton & Co.</u>, 921 A.2d 1100, 1107 (N.J. 2007).  "[M]ere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief." <u>Id.</u> at 1108.  "Although it complicate[s] the precise calculation of damages . . . '[p]roof of damages need not be done with exactitude.... It is therefore sufficient that [a] plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate.'" <u>Id.</u> (citing <u>Lane v. Oil Delivery Inc.</u>, 524 A.2d 405, 409 (N.J. Super. Ct. App. Div. 2004)).

involved management of the various intellectual property (patent, know-how) in discrete parcels: the Licensed Assays.  As the drafters are the parties most familiar with the intent of the contract, it is this Court's job to reflect their clear intentions when confronted with a contractual interpretation question.

When LabCorp materially breached the contract in 1998 by improperly performing the Homocysteine-Only Test, the consequences of this sort of breach were not explicitly identified in the contractual language.  But by maintaining a principle central to the formation of the contract, namely that each individual assay is to be treated separately, the results of such a material breach become clear: Homocysteine-Only Tests were no longer to be considered a Licensed Assay.  Nothing since the entry of judgment, including the Stipulated Stay Order, has altered that result.[85]

The jury in <u>Metabolite I</u> was deciding between two outcomes.  If the jury found for LabCorp, LabCorp would be free to perform the Abbott test without paying any royalties.  If the jury found for Metabolite, LabCorp would no longer be able to perform the homocysteine test.  Regardless of how the jury decided, it was clear that after the trial homocysteine tests would no longer be a Licensed Assay under the License Agreement.  A conclusion otherwise would have resulted in perpetual royalties for the know-how license and would have read the termination clause out of the contract.  A decision for Metabolite here would fail for the same reason.  The terms of the License

---

[85]The patent royalty granted in the Stipulated Stay Order did not revive the old terms of the License Agreement but was instead an entirely new agreement that merely borrowed the existing terms from the License Agreement to reduce complexity of the agreement.

Agreement were permanently altered in August 1998 when LabCorp stopped paying royalties; the jury verdict did nothing more than decide whether LabCorp could continue performing the Homocysteine-Only Test.

For the reasons discussed above, LabCorp was not obligated to pay Metabolite know-how royalties for the Homocysteine-Only test at any time subsequent to entry of judgment in Metabolite I.  Therefore, summary judgment in favor of LabCorp and against Metabolite on the declaratory judgment claim is appropriate.


**VII.    Order**

It is ORDERED that Plaintiff LabCorp's Motion For Summary Judgment Pursuant To Fed. R. Civ. P. 56(c) (Doc. No. 73; Mar. 2, 2007) is granted.  It is

FURTHER ORDERED that a Declaratory Judgment is entered that LabCorp has not violated the License Agreement dated January 31, 1991, with respect to Homocysteine-Only tests performed since judgment entered in Metabolite I.  It is

FURTHER ORDERED that Metabolite's Motion For Partial Summary Judgment (Doc. No. 62; Nov. 8, 2006) is denied.  It is

FURTHER ORDERED that Metabolite's Motion For Summary Judgment On Post-Mandate Royalties (Doc. No. 121; Aug. 17, 2007) is denied.  It is

FURTHER ORDERED that judgment will be entered in favor of LabCorp and against Metabolite.  It is

FURTHER ORDERED that Metabolite's counterclaims and causes of action are dismissed with prejudice.  It is

FURTHER ORDERED that the parties shall bear their own costs and attorney's fees.  It is

FURTHER ORDERED that the jury trial scheduled to commence on Monday, September 22, 2008 at 10:30 AM is vacated.  It is

FURTHER ORDERED that the pre-trial conference set on Thursday, August 21, 2008 at 2:00 PM is vacated.  It is

FURTHER ORDERED that all pending motions are denied as moot.[86]

DATED at Denver, Colorado, this __15th__ day of August, 2008.

BY THE COURT:

_____
ZITA L. WEINSHIENK, Senior Judge
United States District Court

---

[86]Including Metabolite's Unopposed Motion To Amend Its Amended Counterclaim, filed August 14, 2008 (Doc. No. 194), because the desired amendment does not affect the analysis in this Order.

32